**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| JEFFREY BODOFF, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 02-1991 (RCL) |
| ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This action against the Islamic Republic of Iran and a senior official of the Iranian government arises from an act of state-sponsored terrorism. The decedent, a United States citizen named Yonathan Barnea, was killed in the terrorist bombing of the Number 18 Egged passenger bus in Jerusalem, Israel on February 25, 1996. Plaintiffs, surviving family members and the administrator of Yonathan Barnea's estate, have brought this action pursuant to the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602-1611 ("FSIA").

The FSIA grants federal courts jurisdiction over suits involving foreign states and their officials, agents, and employees in certain enumerated instances. In particular, the FSIA creates a federal cause of action for personal injury or wrongful death resulting from acts of state-sponsored terrorism. 28 U.S.C. § 1608(e) (giving federal courts jurisdiction over suits "in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act if such act or provision of material

1

support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency[.]").  The statute explicitly eliminates foreign governments' sovereign immunity in suits for money damages based on extrajudicial killings and provides that "[a]n official, employee, or agent of a foreign state designated as a state sponsor of terrorism . . . shall be liable to a United States national or the national's legal representatives for personal injury or death caused by acts . . . for which the courts of the United States may maintain jurisdiction[.]"  28 U.S.C. § 1605(a)(7); 28 U.S.C. § 1605 note, Civil Liability for Acts of State Sponsored Terrorism.

The defendants, the Islamic Republic of Iran ("Iran") and Ayatollah Ali Hoseini Khamenei ("Khamenei"), were properly served with process pursuant to 28 U.S.C. § 1608 on May 15, 2003, but have failed to enter an appearance in this matter.  As a result, the Court entered default against the defendants on June 4, 2003, pursuant to 28 U.S.C. § 1608(e) and Federal Rule of Civil Procedure 55(a).  Plaintiffs' initial complaint, filed on October 8, 2002, named three additional defendants:  the Iranian Ministry of Information and Security, Ali Akbar Hashemi-Rafsanjani and Ali Fallahian-Khuzestani.  Plaintiffs failed, however, to satisfy the Court that those three defendants were ever properly served.  In response to a November 16, 2005 Order to Show Cause, plaintiffs moved to withdraw the complaint as to the three unserved defendants.  On November 18, 2005, the Court granted plaintiffs' motion and dismissed without prejudice the complaint as to defendants the Iranian Ministry of Information and Security, Ali Akbar Hashemi-Rafsanjani and Ali Fallahian-Khuzestani.  These Findings of Fact and Conclusions of Law, therefore, address plaintiffs' claims only as they relate to the two remaining defendants against whom default has been entered, Iran and Khamenei.

2

Notwithstanding indicia of the willful default of defendants Iran and Khamenei, however, the Court is compelled to make further inquiry prior to entering a judgment by default against them.  As with actions against the federal government, the FSIA requires that a default judgment against a foreign state be entered only after a plaintiff "establishes his claim or right to relief that is satisfactory to the Court."  28 U.S.C. § 1608(e).

Accordingly, the Court has engaged in a careful review of the evidence presented in this case, in light of the other reported cases[1] brought under the antiterrorism provisions of the FSIA.  Pursuant to this Court's September 28, 2005 Order granting plaintiffs' motion to proceed by affidavit, plaintiffs submitted affidavit testimony on October 12, 2005.  Plaintiffs filed Proposed Findings of Fact & Conclusions of Law on October 11, 2005.  In light of significant developments in intervening law since plaintiffs filed their complaint, this Court directed plaintiffs to submit a memorandum on the effect of those changes, which they filed on February 7, 2006.  On that same day, plaintiffs also submitted amended Proposed Findings of Fact & Conclusions of Law.

Notwithstanding the changes in intervening law, plaintiffs never sought to file an amended complaint.  This Court finds, however, that plaintiffs' original complaint is sufficiently detailed to provide fair notice of the claims: it delineates the claims asserted and relief requested.

---

[1] Of particular relevance to this case, three recent FSIA cases before this Court involved the same terrorist bombing that killed Yonathan Barnea.  In *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13 (D.D.C. 2002) (Lamberth, J.), *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1 (D.D.C. 2001) (Bryant, J.), and *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1 (D.D.C. 2000) (Lamberth, J.), this Court held defendants, including those in the present case, jointly and severally liable for the deaths or injuries sustained by other American citizens as a result of the attack.  All of those individuals, like Yonathan Barnea, were aboard the Number 18 Egged bus when it was bombed on February 25, 1996.  While the law has since changed as it relates to some of the legal aspects of these prior cases, namely their reliance on federal common law causes of action, the factual findings relating to the attack remain uncontroverted.

For purposes of the complaint, it is not significant that the source of law underlying the causes of action may have changed.  Courts have not construed the pleading requirements of Federal Rule of Civil Procedure 8 to require a plaintiff to recite specific source(s) of law in a complaint.  *See MacIntosh v. Building Owners & Mgmt. Ass'n Int'l*, 355 F. Supp. 2d 223, 228 (D.D.C. 2005) (Sullivan, J.) (citing FED. R. CIV. P. 8(f) for the proposition that "pleadings shall be construed so as to do substantial justice").  Consequently, this Court finds that plaintiffs are not required to amend their complaint.

Based on a review of the extensive evidence presented, the Court makes the following findings of fact and conclusions of law and will, consistent with them, enter default judgment in favor of plaintiffs and against defendant Iran and defendant Khamenei.

## FINDINGS OF FACT

The following findings of fact are based upon affidavit testimony and documents submitted in accordance with the Federal Rules of Evidence.  Plaintiffs have "establish[d] [their] claim or right to relief by evidence that is satisfactory to the Court," as required by 28 U.S.C. § 1608(e).  This Court finds the following facts to be established by clear and convincing evidence, which would have been sufficient to establish a *prima facie* case in a contested proceeding:

1.    Yonathan Barnea was born on July 16, 1976 in Washington, D.C.  (Nachum Barnea Aff. ¶ 4; Tamara Barnea Aff. ¶ 4; United States Embassy, Tel Aviv, Israel, Report of Death of American Citizen Abroad at 1, Ex. D. to Pls.' Mot. [26] to Amend (hereinafter "U.S. Embassy Rep.").)  He was a United States citizen from the time of his birth until the time of his death on February 25, 1996.  (U.S. Embassy Rep. at 1.)

4

2.      Plaintiff Nachum Barnea is the father of decedent Yonathan Barnea.  (Nachum Barnea

        Aff. ¶ 4.)

3.      Plaintiff Tamara Barnea is the mother of decedent Yonathan Barnea.  (Tamara Barnea

        Aff. ¶ 4.)

4.      Plaintiff Shlomit Barnea is the sister of decedent Yonathan Barnea.  (Shlomit Barnea Aff.

        ¶ 2.)

5.      Plaintiff Uri Barnea is the brother of decedent Yonathan Barnea.  (Uri Barnea Aff. ¶ 2.)

6.      Plaintiff Jeffrey Bodoff brings this action as Administrator of the Estate of Yonathan

        Barnea.

7.      On the morning of February 25, 1996, Yonathan Barnea boarded the Number 18 Egged

        bus in Jerusalem, Israel.  (Nachum Barnea Aff. ¶ 6.)  At about 6:45 a.m. Jerusalem time,

        while Yonathan Barnea was still aboard, another passenger detonated explosives which

        he had carried onto the bus concealed in a travel bag at the direction of Hamas.  *See*

        *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 17, ¶ 9 (D.D.C. 2002)

        (Lamberth, J.); *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 3, ¶ 3 (D.D.C.

        2001) (Bryant, J.); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 4, ¶ 8 (D.D.C.

        2000) (Lamberth, J.).  The resulting explosion completely destroyed the bus, scattered

        debris for at least 100 meters, and led to the injury and death of numerous individuals.

        *See Weinstein*, 184 F. Supp. 2d at 17, ¶ 9; *Mousa*, 238 F. Supp. 2d at 3, ¶ 3; *Eisenfeld*,

        172 F. Supp. 2d at 4, ¶ 8.

8.      As a result of the explosion, Yonathan Barnea was killed.  (Post-Mortem Rep. 1, 4

        (English Trans., Ex. B to Pls.' Mot. [26] to Amend).)

9. Subsequent confessions and other statements to Israeli police and news organizations verified that Hamas was responsible for the attack. *See Weinstein*, 184 F. Supp. 2d at 6, ¶ 23; *Mousa*, 238 F. Supp. 2d at 3, ¶ 4; *Eisenfeld*, 172 F. Supp. 2d at 5, ¶ 16.

10. "Hamas, the popular name for the Islamic Resistance Movement, is an organization supported by The Islamic Republic of Iran, dedicated to the waging of Jihad, or a holy war employing terrorism with the object of seizing the leadership of the Palestinian people and asserting sovereignty and the rule of the Muslim religion over all of Palestine, including all territory of the State of Israel." *Weinstein*, 184 F. Supp. 2d at 6, ¶ 23. *See also Mousa*, 238 F. Supp. 2d at 3, ¶ 5; *Eisenfeld*, 172 F. Supp. 2d at 5, ¶ 17.

11. The affidavit testimony of Dr. Reuven Paz establishes conclusively that the defendants knew of the destructive purposes and objectives of Hamas (Dr. Paz Aff. ¶¶ 47-51), which were set forth in detail in the organization's charter (*id.* at Ex. B). *See also Weinstein*, 184 F. Supp. 2d at 6-7, ¶ 25; *Mousa*, 238 F. Supp. 2d at 4, ¶ 10.

12. Defendant Iran provided substantial financial support for Hamas' terrorist activities during the years immediately preceding the attack. (Dr. Paz Aff. ¶ 47.) *See also Weinstein*, 184 F. Supp. 2d at 7, ¶ 26.

13. Defendant Iran "is a foreign state and has been designated a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C.A. § 2405(j)) continuously since January 19, 1984." *Weinstein*, 184 F. Supp. 2d at 7, ¶ 28. *See also Mousa*, 238 F. Supp. 2d at 4, ¶ 9; *Eisenfeld*, 172 F. Supp. 2d at 5, ¶ 21; *Flatow v. Islamic Republic of Iran*, 999. F. Supp. 1, 11, ¶ 19 (D.D.C. 1998) (Lamberth, J.).

14. "Iranian governmental support for terrorism is an official state policy and the approval of

high-ranking Iranian officials, including Ayatollah Ali Hoseini Khamenei . . . was

necessary for Iran and MOIS to support Hamas with training and economic assistance.

Iran's support of Hamas could not have occurred without this senior leadership approval."

*Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 262, ¶ 12 (D.D.C. 2003)

(Urbina, J.) (internal citations omitted).  *See also* Dr. Clawson Aff. ¶ 23; *Stern v. Islamic*

*Republic of Iran*, 271 F. Supp. 2d 286, 295, ¶ 41 (D.D.C. 2003) (Lamberth, J.).

15. Yonathan Barnea's death was caused by a willful and deliberate act of extrajudicial

killing because it resulted from an explosion of material carried aboard the Number 18

Egged bus on February 25, 1996, intentionally detonated at approximately 6:45 a.m.

Jerusalem time, by another passenger acting under instructions from an agent of Hamas.

*Weinstein*, 184 F. Supp. 2d at 7, ¶ 31; *Mousa,* 238 F. Supp. 2d at 4, ¶ 12; *Eisenfeld*, 172

F. Supp. 2d at 6, ¶ 24.

16. As a result of the death of Yonathan Barnea, his Estate suffered a loss of accretions that

would have been expected to occur during the course of his anticipated life expectancy in

the amount of $1,988,300.  (Dr. Ziderman Rep. at 8, 10.)

17. As a result of the death of Yonathan Barnea, his father, Nachum Barnea, has suffered, and

continues to suffer, severe emotional distress.  (Nachum Barnea Aff. ¶¶ 6-31.)  He

suffered anxiety and distress while waiting for confirmation that Yonathan had been on

the bus that was destroyed.  (*Id.* ¶ 7.)  Upon learning that Yonathan was dead, he faced

the anguishing tasks of telling his son, Uri, that his older brother was dead, and

identifying his eldest son's body.  (*Id.* ¶¶ 13-15.)

18. Nachum Barnea feels an "overwhelming" loss and "tremendous pain" due to the death of

his son.  (*Id.* ¶¶ 20, 24.)  He and his wife have attempted to commemorate their son's life

through donations to organizations in which he had been active.  (*Id.* ¶ 21.)

19.     Despite the passage of many years since the attack, Nachum Barnea still suffers from

insomnia and anxiety triggered by reminders of the attack.  (*Id.* ¶¶ 17, 25-26.)  Holidays

and family events bring up painful memories and reminders of the loss of his son.  (*Id.* ¶

27.)  He speaks of the loss of not getting to see his son grow up, start his own family, and

advance in his own career.  (*Id.* ¶ 29.)

20.     Yonathan Barnea's mother, Tamara Barnea, also suffered in the days surrounding the

attack, and continues to suffer, severe emotional distress.  (Tamara Barnea Aff. ¶¶ 13-33.)

She felt "terrible anxiety" and "total helplessness" while waiting for confirmation that her

son had been a passenger on the bus that was attacked.  (*Id.* ¶ 13.)  She made a number of

telephone calls in search of her son, but eventually was forced simply to wait for news,

during which period her emotional state wavered between hopefulness and despair.  (*Id.*

¶¶ 14-18.)

21.     Tamara Barnea describes the "devastation" she felt upon learning that her son had been

killed, and the pain of never having the opportunity to say goodbye.  (*Id.* ¶¶ 19-20.)  Since

her son's death, she experiences severe anxiety when traveling on a public bus, when

traveling near the area of the attack, when in public places, and when her husband or

surviving children are outside the home.  (*Id.* ¶¶ 25-26.)   Her distress is sometimes

manifested by anxiety attacks, during which she suffers shortness of breath.  (*Id.* ¶ 27.)

22.     Tamara Barnea speaks of the difficulty of balancing her "inner turmoil" with the pressure

of maintaining an appearance of strength for her family's sake.  (*Id.* ¶ 28.)  She feels

8

acutely a sense of loss from the fact that she will not be able to see her son "grow into the person he wanted to be." (*Id.* ¶ 30.) In memory of her son, she and her husband have made contributions to organizations in which Yonathan was active, designated parts of his room as a remembrance, distributed photographs of him throughout the house and their workplaces, and visited his grave frequently. (*Id.* ¶¶ 31-32.) These efforts to commemorate her son's life and preserve his memory, however, cannot heal the "open wound" that losing a child causes. (*Id.* ¶ 33.)

23.    Yonathan Barnea's sister, Shlomit Barnea, also suffered, and will continue to suffer, severe emotional distress due to the loss of her brother. Shlomit remembers being very close to her older brother. (Shlomit Barnea Aff. ¶ 4.) They spent a great deal of time together and she felt that he supported her. (*Id.*)

24.    Shlomit Barnea describes the anguish she suffered while it was unclear whether her brother had been killed, and the shock and pain she felt upon receiving confirmation of his death. (*Id.* ¶¶ 7-11.) The loss of her brother was particularly difficult because she did not have an opportunity to say goodbye, and she feels as though she has been left alone to contend with a range of conflicting emotions relating to the fact that her relationship with her brother was cut short. (*Id.* ¶¶ 12-13.)

25.    Shlomit Barnea also describes lingering anxiety arising from sirens, bus transportation or vicinity to the attack site. (*Id.* ¶¶ 14, 19.) While she has tried to move on with her life, the death of her brother has indelibly marked her identity and she is unable to escape her grief. (*Id.* ¶¶ 16, 19-22.)

26.    Uri Barnea, the youngest child in the Barnea family, also suffered, and continues to

suffer, severe emotional distress from the loss of his big brother.  (Uri Barnea Aff. ¶¶ 2-
18.)  Uri admired his older brother, and felt fortunate that his brother helped him with
homework, supported him, and treated him like a friend.  (*Id.* ¶¶ 3-5.)  On the day of the
attack, Uri experienced – along with his family – the anguish of not knowing what had
happened to his brother.  (*Id.* ¶¶ 7-10.)  As a young child at the time, it was particularly
distressing for him to see his family so upset.  (*Id.* ¶ 10.)

27.     As expressed by other members of the family, Uri also found it painful to have no
opportunity to say goodbye to his brother.  (*Id.* ¶ 11.)  He feels that he lost some of his
innocence as a result of his brother's death, and no longer views the world with the same
feelings of optimism and security.  (*Id.* ¶¶ 12-15.)  He describes the pain of missed
opportunities to spend time with his brother and of knowing that his brother cannot watch
him grow up.  (*Id.* ¶¶ 15-16.)

28.     Uri also suffers continued distress relating to his changed relationship with his parents.
(*Id.* ¶ 17.)  He feels restricted by their heightened fear for his safety, but he also feels
obligated to comply with their requests so as to minimize their distress.  (*Id.*)  Uri
describes the deep pain of losing his brother as one that he will carry for the rest of his
life, something that others cannot understand.  (*Id.* ¶ 18.)

## CONCLUSIONS OF LAW

### I.     Legal Standard for FSIA Default Judgment

Under the Foreign Sovereign Immunities Act, "[n]o judgment by default shall be entered
by a court of the United States or of a state against a foreign state . . . unless the claimant
establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e);

*Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232-33 (D.C. Cir. 2003), *cert. denied*, 542
U.S. 915 (2004).  "In evaluating plaintiffs' proof, the court may accept as true the plaintiffs'
uncontroverted evidence." *Campuzano*, 281 F. Supp. 2d at 268 (internal citations omitted).
Plaintiffs' evidence may take the form of sworn affidavits. *Id.* (citing *Weinstein*, 184 F. Supp. 2d
at 19).

## II.   Jurisdiction

The Foreign Sovereign Immunities Act provides the sole basis for asserting jurisdiction
over foreign sovereigns in the United States.  *See Argentine Republic v. Amerada Hess Shipping
Corp.*, 488 U.S. 428, 434-35 (1989).  The "state-sponsored terrorism" exception provides that a
foreign sovereign will not be immune to suit in U.S. courts where:

> money damages are sought against a foreign state for personal injury
> or death that was caused by an act of torture, extrajudicial killing,
> aircraft sabotage, hostage taking, or the provision of material support
> or resources (as defined in section 2339A of title 18) for such an act
> if such act or provision of material support is engaged in by an
> official, employee, or agent of such foreign state while acting within
> the scope of his or her office, employment, or agency.

28 U.S.C. § 1605(a)(7).  To subject a foreign sovereign to suit under section 1605(a)(7),
plaintiffs must demonstrate: (1) that the foreign sovereign was designated by the State
Department as a "state sponsor of terrorism"; (2) that the victim or plaintiff was a U.S. national
at the time the acts took place; and (3) that the foreign sovereign engaged in conduct that falls
within the ambit of the statute, in this case, providing material support or resources for an act of
extrajudicial killing.

Each of the requirements has been satisfied in this case.  Defendant Iran is, and was at the
time of the attack, designated a state sponsor of terrorism.  *See* 31 C.F.R. § 596.201 (2001).  As

to defendant Khamenei, the applicable FSIA section is the Flatow Amendment, which provides

that

> an official, employee, or agent of a foreign state designated as a state
> sponsor of terrorism, while acting within the scope of his or her
> office, employment, or agency shall be liable to a United States
> national or the national's legal representative for personal injury or
> death caused by acts of that official, employee, or agent . . . for money
> damages which may include economic damages, solatium, pain, and
> suffering, and punitive damages if the acts were among those
> described in § 1605(a)(7).

28 U.S.C. § 1605 note, Civil Liability for Acts of State Sponsored Terrorism.  Defendant

Khamenei,  while acting within the scope of his office and employment, provided material

support and resources to Hamas for the attack.  *See* Dr. Clawson Aff. ¶ 23; *Stern*, 271 F. Supp.

2d at 295, ¶ 41; *Campuzano*, 281 F. Supp. 2d at 262, ¶ 12.  Such acts would subject an official of

the United States to liability.  *See Stern*, 271 F. Supp. 2d at 298 (citing 42 U.S.C. § 1983, *Bivens*

*v. Six Unknown Named Agents*, 403 U.S. 388 (1971)).  The victim, Yonathan Barnea, was a U.S.

national at the time of the attack.  (Nachum Barnea Aff. ¶ 4; U.S. Embassy Rep. at 1.)  Defendant

Iran's and defendant Khamenei's knowing support of an entity that committed an extrajudicial

killing squarely falls within the ambit of the statute.

Personal jurisdiction over a non-immune foreign sovereign and an official thereof exists

so long as service of process has been made under Section 1608 of the FSIA.  *Stern*, 271 F. Supp.

2d at 298.  Such service has been made, and this Court has *in personam* jurisdiction over

defendants Iran and Khamenei.

### III.    Liability

#### A.    Proper Causes of Action Under the FSIA

Once a foreign state's immunity has been lifted under Section 1605 and jurisdiction is proper, Section 1606 provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Section 1606 acts as a "pass-through" to substantive causes of action against private individuals that may exist in federal, state or international law. *See Dammarell v. Islamic Republic of Iran*, Civ. A. No. 01-2224, 2005 WL 756090, at *8-10, 2005 U.S. Dist. LEXIS 5343, at *27-32 (D.D.C. Mar. 29, 2005) (Bates, J.).

In this case, state law provides a basis for liability. First, the law of the United States applies rather than the law of the place of the tort or any other foreign law. This is because the United States has a "unique interest" in having its domestic law apply in cases involving terrorist attacks on United States citizens. *See Dammarell*, 2005 WL 756090, at *20, 2005 U.S. Dist. LEXIS 5343, at *63.

Second, the applicable state law is that of the District of Columbia. As the forum state, its choice of law rules apply to determine which state's law shall apply. Under District of Columbia choice of law rules, courts employ a refined government interest analysis under which they "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989) (citations and internal quotations omitted). This test typically leads to the application of the law of plaintiff's domicile, as the state with the greatest interest in providing redress to its citizens. *See*

*Dammarell*, 2005 WL 756090, at *20-21, 2005 U.S. Dist. LEXIS 5343, at *66-67 (citing REST. (THIRD) FOREIGN RELATIONS LAW § 402(3) (1987)).  Here, although plaintiffs have no current United States domicile, members of the family, including the decedent, were formerly domiciled in the District of Columbia.  There is no other American state with an interest in the case.[2] Therefore, the District of Columbia has the greatest interest, and thus the application of its law is proper.

Third, as required by 28 U.S.C. § 1606, District of Columbia law provides a cause of action against private individuals for the kind of acts that defendants allegedly committed. Plaintiffs seek damages for wrongful death and intentional infliction of emotional distress, each of which is a tort for which private individuals may face liability.  The Court's next task is to determine whether plaintiffs have demonstrated defendants' liability and their right to damages under the laws of the District of Columbia.

### B.    Vicarious Liability

The purported basis of defendants' liability is that they provided material support and resources to Hamas, the organization that personally completed the attack.  One party may be liable for the acts of another under theories of vicarious liability, such as conspiracy, aiding and abetting and inducement.  This Court finds that civil conspiracy provides a basis of liability for defendants Iran and Khamenei and thus declines to reach whether they might also be liable on the basis of aiding and abetting and/or inducement.

A civil conspiracy exists under District of Columbia law where there is "(1) an agreement

---

[2] While the analogy is not exact, this Court notes that a prior decision recited that claims by American citizens temporarily domiciled overseas are governed by their last United States domicile.  *See Dammarell*, 2005 WL 756090, at *22, 2005 U.S. Dist. LEXIS 5343, at *71-72.

between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury or death caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (1983)).

The agreement may be inferred from conduct. *Weishapl v. Sowers,* 771 A.2d 1014, 1023 (D.C. 2001) (citing *Halberstam*, 705 F.2d at 480) ("Where there is no direct evidence of an agreement between the alleged co-conspirators, there must be circumstantial evidence from which a common intent can be inferred."). Here, it has been established that Hamas agreed together with defendants Iran and Khamenei to commit terrorist activities in furtherance of the goals of eradicating the Jewish state of Israel and promoting Islamic ideology. *See Weinstein*, 184 F. Supp. 2d at 8-9; *Mousa*, 238 F. Supp. 2d at 9; *Eisenfeld*, 172 F. Supp. 2d at 7. This agreement can be inferred from the comprehensive financial support and training that Iran provides to Hamas. *See Weinstein*, 184 F. Supp. 2d at 7, ¶¶ 26-27, 8-9; *Mousa*, 238 F. Supp. 2d at 4, ¶¶ 9-11, 9; *Eisenfeld*, 172 F. Supp. 2d at 5, ¶¶ 17-20, 7. Indeed, as this Court has previously noted, the very "[s]ponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks." *Flatow*, 999 F. Supp. at 27.

It is undisputed that Hamas committed the attack that killed Yonathan Barnea. *See Weinstein*, 184 F. Supp. 2d at 6, ¶ 23; *Mousa*, 238 F. Supp. 2d at 3, ¶ 4; *Eisenfeld*, 172 F. Supp. 2d at 5, ¶ 16. It also has been established also that the attack was committed in furtherance of the broad common scheme between Hamas and Iran. *See Weinstein*, 184 F. Supp. 2d at 6, ¶ 23; *Mousa*, 238 F. Supp. 2d at 3, ¶ 5; *Eisenfeld*, 172 F. Supp. 2d at 5, ¶ 17. Therefore, the elements

15

of civil conspiracy are established between the defendants in this case and the actual perpetrators of the attack.

### C.     Wrongful Death

Plaintiffs assert that defendants are vicariously liable for the wrongful death of Yonathan Barnea.  Under District of Columbia law, a claim for wrongful death arises when "the death of a person is caused by the wrongful act" of defendant.  D.C. Code Ann. § 16-2701 (2001).  The cause of action "authorizes a personal representative of the deceased to claim damages measured as the economic loss caused by the death of a person wrongfully killed."  *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001) (Jackson, J.) (applying District of Columbia law of wrongful death).  In this case, defendants Iran and Khamenei engaged in the wrongful acts of conspiring with, and providing material support to, Hamas in furtherance of terrorist activities that caused the death of Yonathan Barnea.  Accordingly, defendants Iran and Khamenei are liable for wrongful death.

### D.     Intentional Infliction of Emotional Distress

Plaintiffs also claim that defendants are vicariously liable to each plaintiff for intentional infliction of emotional distress.[3]  Under District of Columbia law, the elements of intentional infliction of emotional distress are (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.

---

[3] It should be noted that plaintiffs initially styled their claims as solatium and/or loss of consortium in their initial complaint.  (Compl. 10-12.)  Since the District of Columbia denies recovery for those causes of action, this Court shall consider, consistent with plaintiffs' request and legal precedent, plaintiffs' claims under the cause of action of intentional infliction of emotional distress, which is recognized by the District of Columbia.  *See Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) (Jackson, J.); *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 269 n.8 (D.D.C. 2002) (Friedman, J.); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001) (Jackson, J.).

*Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984) (citations and internal quotations omitted).

The elements are satisfied in this case.

First, a terrorist attack constitutes extreme and outrageous conduct. *Cf. id.* at 986

("Actions which violate public policy may constitute outrageous conduct sufficient to state a

cause of action for infliction of emotional distress.") (citations omitted); *see also Stethem v.*

*Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) (Jackson, J.) ("[A]cts of

terrorism are by their very definition extreme and outrageous and intended to cause the highest

degree of emotional distress, literally, terror."). A suicide bombing constitutes an act of such

extreme and outrageous conduct that the second element is satisfied as well. That is, the

emotional distress caused to plaintiffs was intentionally or recklessly caused by the suicide

bomber by virtue of the act itself. *Id.* ("[T]he intent or recklessness can be inferred from the

outrageousness of the acts.") (citations omitted). As to the third element, each of Yonathan

Barnea's surviving family members in this case have established in great detail the severe

emotional distress that resulted from the attack.

It should be noted that, under District of Columbia law, actual physical injury is not

necessary to establish the elements of intentional infliction of emotional distress. *Howard Univ.*,

484 A.2d at 985 (citing *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980) (noting that "an

action for intentional infliction may be made out even in the absence of physical injury or

impact")).

**IV.     Damages**

As a result of the wrongful conduct of defendants Iran and Khamenei, Yonathan Barnea's

estate suffered loss of accretions, and plaintiffs have suffered, and will continue to suffer, severe

17

emotional distress.  Since a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606, plaintiffs are entitled to the typical array of compensatory damages that may be awarded against tortfeasors in the District of Columbia.

In determining the appropriate compensatory damages for each plaintiff's emotional suffering, this Court is guided not only by prior decisions awarding damages for solatium and loss of consortium, but also by those which awarded damages for pain and suffering.  *Cf. Wagner*, 172 F. Supp. 2d at 135 n.11 (noting that, in an intentional homicide case, "solatium appears in any event to be indistinguishable from the intentional infliction of emotional distress"); *see also Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (Friedman, J.) ("In the context of FSIA cases, this Court has recognized the claim of solatium as . . . indistinguishable from the claim of intentional infliction of emotional distress.").[4]

### A.      Loss of Accretions to the Estate of Yonathan Barnea

Plaintiffs submitted a comprehensive report from Professor Adrian Ziderman detailing the loss of accretions to the Estate of Yonathan Barnea.  (Dr. Ziderman's Rep. *passim*.) Professor Ziderman based his calculations on conservative assumptions about the career that Yonathan Barnea might have had if he had survived.  (*Id.*)  The calculations are discounted to present value and reflect deductions for taxes.  (*Id.* at 5-7.)  In accordance with Professor Ziderman's report, the Court concludes that judgment should be entered for this element of damages for the Estate of Yonathan Barnea in the amount of $1,988,300.

---

[4] It should be noted that, while intervening changes in law have ruled many cases' reliance on federal common law improper, such findings need not disturb the accuracy of the analogy between solatium and intentional infliction of emotional distress.

### B.        Severe Emotional Distress

Generally, compensatory damages awards to surviving family members for emotional suffering must be determined by the nature of the relationship and, if applicable, the severity and duration of the pain suffered by the decedent.  Although determining an appropriate figure for intangible losses such as emotional suffering is notoriously difficult and must be guided by the facts of each individual matter, prior case law has established some guidelines.  Generally speaking, in cases involving attacks such as the one that killed Yonathan Barnea, parents of the decedent are typically awarded $5,000,000 each, while siblings usually receive awards of $2,500,000.  *See Eisenfeld*, 172 F. Supp. 2d at 8 (awarding $5 million each to the parents and $2.5 million each to the siblings of victims of the same suicide bombing that killed Yonathan Barnea); *Flatow*, 999 F. Supp. at 31 (awarding parents each $5 million and siblings each $2.5 million of victim who was killed in the bombing of a passenger bus in the Gaza strip).

Yonathan Barnea's father, Nachum Barnea, suffered greatly in the days surrounding the attack, and continues to suffer to this day.  (Nachum Barnea Aff. ¶¶ 6-31.)  February 25, 1996 was a day of numerous events that caused him great emotional distress, including waiting in uncertainty, telling his younger son the news, and identifying Yonathan's body.  (*Id.* ¶¶ 7-15.)  In addition, as time has passed since the attack, Nachum Barnea continues to suffer severe emotional distress and anxiety due to the loss of his son.  (*Id.* ¶¶ 17, 20, 24-26.)  Holidays and family events are particularly painful, as is the knowledge that he will never have the privilege of seeing his son grow older.  (*Id.* ¶¶ 27, 29.)  The severe emotional distress that Nachum Barnea has suffered, and will continue to suffer, from the loss of his son, is aptly demonstrated by the testimony presented.  Accordingly, this Court finds that Nachum Barnea is entitled to an award

19

of $5,000,000.

Yonathan Barnea's mother, Tamara Barnea, also suffered greatly in the days surrounding the attack, and continues to suffer to this day.  (Tamara Barnea Aff. ¶¶ 13-33.)  On the day of the attack, she suffered a gamut of emotions, including "terrible anxiety," "total helplessness," fleeting hopefulness, devastation and despair.  (*Id.* ¶¶ 13-19.)  Never having the opportunity to say goodbye to her son also caused her emotional distress.  (*Id.* ¶ 20.)  She continues to experience severe anxiety, sometimes in the form of anxiety attacks, when reminded of the bombing, and when she is uncertain of the whereabouts of her surviving family members.  (*Id.* ¶¶ 25-27.)

Tamara Barnea continues to suffer "inner turmoil" and the pressure to appear strong for her family, as well as a sense of loss from the fact that she will never be able to see Yonathan grow up.  (*Id.* ¶¶ 28, 30.)  In memory of her son, she and her husband have donated to organizations in which he had been active, designated parts of his room as a remembrance, distributed photographs of him throughout the house and their workplaces, and visited his grave frequently (*id.* ¶¶ 31-32), but she still suffers an "open wound" from the loss of her child (*id.* ¶ 33).  The severe emotional distress that Tamara Barnea has suffered, and will continue to suffer, from the loss of her son is aptly demonstrated by the testimony presented.  Accordingly, this Court finds that Tamara Barnea is entitled to an award of $5,000,000.

Yonathan Barnea's siblings, Shlomit and Uri Barnea, have also suffered greatly, and will continue to suffer, due to the loss of their brother.  Although they each enjoyed a unique relationship with Yonathan, they both felt close to him, spent a great deal of time with him, and felt that he supported them.  (Shlomit Barnea Aff. ¶ 4; Uri Barnea Aff. ¶¶ 3-5.)  The day of the

attack was extremely painful for each sibling, during which they suffered uncertainty, shock and pain.  (Shlomit Barnea Aff. ¶¶ 7-11; Uri Barnea Aff. ¶¶ 7-10.)  Uri, as a young child at the time, was particularly troubled by seeing his family so distressed.  (Uri Barnea Aff. ¶ 10.)

The siblings have continued to suffer as time has passed since the attack.  They both describe the lack of an opportunity to say goodbye as particularly distressing.  (Shlomit Barnea Aff. ¶ 12; Uri Barnea Aff. ¶ 11.)  Shlomit describes the pain of being left alone to contend with a range of conflicting emotions resulting from the loss of her brother, and the anxiety she feels when she hears sirens, travels by bus or is near the attack site.  (Shlomit Barnea Aff. ¶¶ 12-14, 19.)  Uri misses spending time with his brother and wishes that his brother could have seen him grow up, and describes feeling that he lost some of his innocence as a result of his brother's death.  (Uri Barnea Aff. ¶¶ 12-16.)  Uri also suffers continued distress relating to his perceived duty to minimize his parents' distress by acquiescing to the limitations they impose on his mobility since the attack.  (*Id.* ¶ 17.)

Shlomit and Uri each describe the difficulty of moving on with their lives, and the permanent way in which the death of their brother has changed them.  (Shlomit Barnea Aff. ¶¶ 16, 19-22; Uri Barnea Aff. ¶ 18.)  In light of the severe emotional distress that Shlomit has suffered, and will continue to suffer, due to the loss of her brother, this Court finds that Shlomit Barnea is entitled to an award of $2,500,000.  Similarly, in light of the severe emotional distress that Uri has suffered, and will continue to suffer, due to the loss of his brother, this Court finds that Uri Barnea is entitled to an award of $2,500,000.

## C.    Punitive Damages

While punitive damages are not available against foreign states,[5] they may be assessed against agents or instrumentalities thereof, or officials acting in their official capacity.  *Cf.* 28 U.S.C. § 1606 ("[A] foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages."); 28 U.S.C. 1605 note, Civil Liability for Acts of State Sponsored Terrorism.  *See also Campuzano*, 281 F. Supp. 2d at 277 (citing cases); *Weinstein*, 184 F. Supp. 2d at 24 n.1.  Accordingly, plaintiffs may not recover punitive damages against defendant Iran.  As to defendant Khamenei, however, punitive damages may be asserted, because his actionable conduct was performed in his official capacity as an Iranian government official.  Such punitive damages shall be awarded to the Estate of Yonathan Barnea, rather than to those plaintiffs who are surviving family members.  *See Campuzano*, 281 F. Supp. 2d at 278.

In determining the proper punitive damages award, courts evaluate four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Acree v. Republic of Iraq*, 271 F. Supp. 2d 179, 222-23 (D.D.C. 2003) (Roberts, J.) (citing *Flatow*, 999 F. Supp. at 32), *vacated on other grounds,* 370 F.3d 41 (D.C. Cir. 2004).  In cases such as this, the analysis typically results in punitive damages in an amount three times Iran's annual expenditure on terrorism, or $300,000,000.  *See, e.g., id.* at 223-24; *Stern*, 271 F.

---

[5] In *Flatow*, this Court awarded significant punitive damages to the plaintiffs based on § 1605(a)(7) and the Flatow Amendment.  999 F. Supp. at 32-34.  Plaintiffs in this case similarly requested punitive damages in their complaint.  In the intervening years, however, the law has changed dramatically.  *See Roeder*, 333 F.3d at 234*; Holland, et al. v. Islamic Republic of Iran, et al.*, Civ. A. No. 01-1924 (CKK) (D.D.C. Oct. 31, 2005) (Kotelly, J.); *Dammarell,* 2005 WL 3418304, at *5, 2005 U.S. Dist. LEXIS 32618, at *14-15; *Collett v. Socialist Peoples' Libyan Arab Jamahiriya,* 362 F. Supp. 2d 230, 243 (D.D.C. Mar. 24, 2005) (Urbina, J.); *Kapar v. Islamic Republic of Iran*, Civ. A. No. 02-78 (HHK), at 19 n.3 (D.D.C. Sept. 22, 2004) (Kennedy, J.).  Punitive damages are thus not available in this action against defendant Iran.

Supp. 2d at 300-02; *Campuzano*, 281 F. Supp. 2d at 279; *Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222, 235-36 (D.D.C. 2002) (Lamberth, J.), *abrogated on other grounds, Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004)); *Eisenfeld*, 172 F. Supp. 2d at 9.

As to the first factor, the Court determines that the character of the bombing is extremely heinous. *Campuzano*, 281 F. Supp. 2d at 278 (citing *Acree*, 271 F. Supp. 2d at 222-23). "The defendants' demonstrated policy of encouraging, supporting and directing a campaign of deadly terrorism is evidence of the monstrous character of the bombing that inflicted maximum pain and suffering on innocent people." *Id*. Such conduct is unconscionable. *Id*. (citing *Cronin*, 238 F. Supp. 2d at 235). Second, the nature and extent of the harm to both the decedent and his surviving family members was painfully demonstrated by affidavit testimony in this case. This harm was caused, and was intended to be caused, by defendant Khamenei, by virtue of his involvement in a civil conspiracy to commit terrorist attacks with Hamas and defendant Iran. Third, as this Court has previously noted, "only a large amount of punitive damages can serve as an effective deterrent against future terrorist acts." *Id*. at 279 (citing *Stern*, 271 F. Supp. 2d at 300-01). Fourth, expert affidavit testimony establishes that defendant Khamenei, as an official of Iran, has a great deal of money at his disposal. (Dr. Clawson Aff. ¶ 15 (estimating Iran's annual terrorism expenditures at $100-200 million).) Taking all of these factors into account, and the precedent of this Court, the Court shall apply the formula of three times defendant Iran's annual expenditure on terrorism to award punitive damages against defendant Khamenei. A punitive damages award, accordingly, shall be entered in the amount of $300,000,000, to be awarded to the Estate of Yonathan Barnea.

## <u>CONCLUSION</u>

This Court takes note of plaintiffs' courage and steadfastness in pursuing this litigation and their efforts to take action to deter more tragic suffering of innocent Americans at the hands of terrorists.  Their efforts are to be commended.


A judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, March 29, 2006.